All right. Good afternoon, Council. The Court appreciates your participation in our virtual forum, and we are ready to begin. Mr. Gordon? Yes, Your Honor. May it please the Court, my name is Gerald Gordon, and the parties I represent are commonly referred to as the Ohadi-Wooley parties. The Ohadi Trust, KMW Business Jets, and Alta Holdings each made separate loans to JMG. Paul Ohadi is a trustee of the Ohadi Trust. Ken Wooley is a principal of KMW and Alta. While the errors committed by the District Court are generally common to each of them, there are distinctions between their legal positions which need to be considered. What is important is a legal position espoused by International, which was set forth by Mr. Yormark as their fraudulent transfer expert. I would refer you to the appendix, page 003952, which is page 228 of the transcript of the trial before Judge Gatton and the cross-examination of Mr. Yormark by my partner, Ms. Turner. At line 15, question. So your opinion is so long as the plaintiff is not paid on their loan, the $6.5 million plus interest, any payments that were made to other creditors are fraudulent transfers? Yes. In essence, every payment made to the Ohadi Trust, to Alta, and KMW were fraudulent transfers. Counsel, did the District Court make any conclusion about these related parties and entities that you described that you are telling us about are insiders or related in such a way that treating them collectively makes sense? The court made a series of insider decisions. Actually, the decision doesn't make sense for this reason. What it's basically saying is every payment made to Ohadi Trust, Alta, and KMW was a fraudulent payment. No matter when it was made. Every payment made to any creditor of JMG was a fraudulent payment as long as international was not paid. I'll come to the issue of the insider, which we extensively addressed in a moment. International, as we cite in our brief from Finn, quote, equality among the debtors credited is not the purpose of the UFTA. Despite that, the underlying legal theory international espoused and the District Court accepted was that since JMG failed to pay the $6.5 million obligation, which came due on September 15, 2016, each and every payment totaling $41 million received by the Ohadi Trust, KMW, and Alta was a fraudulent transfer because international was not paid by JMG. In total, the Ohadi Trust, KMW, and Alta loaned JMG $61 million beginning in August of 2015 with the Ohadi Trust loan of $11 million replacing a prior secure loan followed by the Alta and KMW loans. The Ohadi Trust loan was secured by a probably perfected blanket lead in JMG tangible and intangible assets. The KMW and Alta loans were for specific assets purchased by JMG with the loan proceeds and were secured by purchased money security interest in the collateral purchase. It wasn't until after consummation of the Ohadi Trust loan that, and with the knowledge of the Ohadi loan, international made a purchase money loan to JMG for the purchase of one aircraft. This is no dispute. The loan was made in September 15, 2015 for $6.5 million. It matured. It was to mature on September 15, 2016. The loan was secured by the planning and the proceeds. What language do you cite in the agreement for the proposition that there was this blanket security that covered everything? That was an issue before the court. If you look at both the security agreement, it says substantially all. Substantially all is not all. Is there something that describes what's included and what's not included? You're right. But if you look at the financing statement, it says it doesn't have substantially all. It says all assets. This is to be interpreted under New York law. The court in June of 2018, in a motion brought by international, held it was a valid perfected security interest in the assets. Later on in this decision, the court found that substantially all modified each of the assets and therefore was vague and ambiguous. We cited to the court then, and we cite to this court, significant New York law, which holds that you look to the intent of the parties, you look to the entirety of the agreement, you look to everything to determine. Based on that, Mr. Ohadi had a blanket lien. But the fact is he had a lien. He had a valid legitimate loan. Every payment that Mr. Ohadi received, even if it were to be unsecured, was a payment on the obligation. And for each payment he received, there was reasonably equivalent value received by JMG. JMG received $11 million from him. Each payment they made was a reduction of that obligation and reflected on their books. Mr. Gordon, maybe I'm just not capable of following what's going on inside the documents in this record. But I'm going to tell you that I was having a hard time finding in the record, like you made a claim at 28 to 31 of your brief where you said that there is evidence that JMG's transfers were directly tied to repayments. All those loans to JMG. And it directs us to documents. But those documents are hundreds of pages long. And I cannot for the life of me find where in those specific documents that nexus is. And just to make plain, there's another spot too that was really kind of hard for me. And that's the October 4th, 2016 payment of $872,000. And the May 3rd, 2017 $3.7 million. And the April 21st, 2017 $5 million. You cite to a document and I just can't find it. So is it possible that you could pinpoint the sites so that I could at least... I can't do it at this moment. But Your Honor, that goes to the very problem that we had in front of Judge Katan. We attempted to... there were a series of transactions. There's a score of transactions. Yet Judge Katan, based on the position taken by Mr. Eberbach, ignored all that. We put on evidence to go through each transaction. We attempted to, even though the burden's on international, to prove that each transfer is fraudulent. Each transfer. But Judge Katan comes off and said, no, you can't do that. I'm not going there. I've already made up my mind, in essence. So you're right. And that's what a court is supposed to do before it enters a judgment for $41 million, which is predicated on payments. Payments that were actually made against a $61 million in loans. They went $61 million. They got $41 million in payments on those loans. And yet, Judge Katan simply held, based on Mr. Eberbach, that project. I want to reserve seven minutes for my argument. Counsel, Judge Kalten has a question. Well, I just didn't understand what Judge Katan's approach to the case had to do with why you didn't put page citations in your brief. I'm sorry. Yes, they're separate. If we didn't do that, I apologize. It's just so extensive to try to put page citations. Of course it is, but you're asking us to review a 250-page document to find a needle in a haystack. I mean, that's not particularly helpful. Briefing is the point. I'm sorry, I'm not. We'll do the best we can with it. No, I'm not. What I'm trying to say is that Judge Katan, as a matter of law, erred by simply saying every transfer, every payment was a fraudulent transfer. Despite the fact it didn't meet the standards of definition of a valid lien, he ignored that, he ignored reasonable equivalent value, he simply said it's all fraudulent. Okay, I understand the legal point you're making. Thank you. Thank you. I would reserve any further time. Thank you, Mr. Gordon. Mr. Sant. Thank you. May it please the court, my name is Jeffrey Sant. I represent Plaintiff Appellee and Judgment Creditor Jet Midwest International Co., Ltd. In a 215-page decision, after a four-day trial, the court found appellants committed a massive fraud, not just against my client, but against federal courts and the U.S. Marshals Service. The court found each transfer both intentionally fraudulent and also constructively fraudulent under four separate constructive fraud statutes. These are five alternatives, each sufficient to affirm the judgment. The finding of intent to defraud is a factual finding, reviewed for clear error. A transfer is fraudulent if the debtor made the transfer with actual intent to hinder, delay, or defraud, and that's it. There are no other elements required. The evidence here of intentional fraud includes misleading courts, concealing evidence and assets, deceiving the U.S. Marshals, and making false statements under oath. As an example, in 2020, this court affirmed the district court's preliminary injunction and its findings of likelihood of success and irreparable harm. This court ordered the preservation of my client's remaining secured collateral, hundreds of aircraft parts. Appellants opposed the preliminary injunction by promising this court and the district court that my client's collateral was safely set aside. Despite this promise, despite this court's affirmance of the injunction, all my client's collateral is now gone. All of it sold, violating this court's injunction, all of the money from the sales, gone. Meanwhile, JMG funneled another $1.5 million to Ojadiwoli. By contrast, my client's garnishments of JMG's bank accounts has collected just $290. Now, appellants were running a foreclosure auction of my client's secured collateral at the time of the preliminary injunction. JMG gave Ojadiwoli a list of its inventory for that auction, almost every item of which had been concealed from the bankruptcy court and from my client during post-judgment discovery. Massive amounts of concealed inventory, 46 aircraft, over 80,000 spare parts, never mentioned in sworn statements to the bankruptcy court. The inventory list given to appellants was hundreds of pages long. The inventory list given to the bankruptcy court was a page and a half. As this court found, JMG concealed my client's collateral in post-judgment discovery and also from the bankruptcy court. But they revealed it to appellants. This court was not the first to have its orders disobeyed so JMG could secretly send appellants money. In January 2018, appellants counsel directed JMG to defeat a pending TRO by concealing assets, lying to the U.S. Marshals and sending assets to appellants. This is findings of fact 258 through 285. Specifically. I know there's a little bit of factual findings. Judge Carlton, we're getting some feedback. Might turn your mic down or get a little closer to it or something. Shall I continue? Let me try to ask a question. Hang on and see if we can get Judge Carlton's audio a little clearer. Can you hear me now? Yes. That's better. Stay a little closer to the mic, that may help. Okay. I was just asking whether Mr. Sant could address the legal point that Mr. Gordon spent time on in his argument. Which is, as I understood it, that the district court erred by declaring that every payment, as he put it, to any creditor or to any of these different entities was fraudulent. Is that your understanding of the order? And if so, you defend it. Well, if I may make three responses, Your Honor. First, it is absolutely incorrect to state that the district court simply adopted the expert witness's testimony at trial. The court does not have to take my word for it. Shortly after the snippet that Mr. Gordon quoted, the court said, quote, I don't think it really matters from his expert point of view. He's focused on resources available to pay the loan back. The court recognized that the forensic accounting expert was testifying about funds and was not making an opinion about MUFTA, the Missouri Uniform Fraudulent Transfer Act. Second point, if there's actual intent to defraud my client and that this is the underlying purpose of shifting and siphoning funds out of JMG any time money came in to send it to the concealed owners, oh hotty woolly, then yes, these transfers are fraudulent. Third important point, appellants did not have and never had a perfected lien over any of the cash or stock fraudulently transferred to them. Those were the only transfers actually consummated, cash and stock. To perfect liens over cash or stock, you must physically possess it or trace the cash to sale of secured collateral. And that's in conclusions of law 290 through 308. Appellants clearly did not possess physically the money that had to be sent to them. And appellants never attempted a tracing analysis, which is their burden. Under both the UCC and Missouri statute 400.9-315, quote, the secured party identifies the proceeds by a method of tracing. Appellants never did that. By contrast, JM International proved at trial through tracing that JMG sent to appellants 5 million in cash over which my client had a perfected security interest because that money came from the sale of our aircraft. Also, appellants' liens are fraudulent. The SAA dated February 23, 2018 is a fraudulent lien. February 23, 2018 is less than 24 hours after my client served its garnishment writ. One week after the fraudulent transfer action was filed and three days before JMG filed its first bankruptcy. The SAA tried to grant the Ohati Trust a backdated blanket lien over all JMG's assets backdated to August 2015, one month prior to my client's loan. Wooley, one of the appellants, signed the SAA on February 28, two days after the bankruptcy filing. When Wooley was asked about this at trial, he testified that he signed the SAA on February 23, but it was somehow notarized five days later. Wooley's personal lawyer and notary testified that Wooley's testimony was false. All of this shows that the court correctly found appellants intended their frauds. Their testimony lacks credibility and appellants are insiders. Paragraph 56 of the findings of fact, and this is the block quote that is at the end of page 12 and onto page 13 of the findings of fact. It quotes Wooley's 2017 email with appellants counsel and with JMG discussing the plan to lie about appellants ownership of JMG. At the top of page 13 it says, quote, this is Mr. Wooley's email, quote, It would be better for Paul Ohati not to own 20% of JMG because being both a creditor and owner puts his position as a creditor in case of bankruptcy or liquidation at some risk, end quote. This shows intent to the fraud, knowledge of JMG's insolvency and insider status. Appellants do not challenge the conspiracy finding. Conspiracy shows intent. There is no good faith in a conspiracy and there can be no good faith and reasonable value defense. The court found bad faith, end quote, further evidence of bad faith. That's conclusions of law 190, 192 and 268. Now appellants state in footnote 27 of their reply that anytime we do not respond to something they say they will treat that in their reply as a concession. And they do this whenever we don't parrot their exact language. So to be very clear, we do not agree that appellants advanced 61 million to JMG. If you look at footnote 2 in their reply, what do they cite to for this? OWADD 249 to 252. It's a chart created by Appellants Litigation Council that was never adopted by the court or used by any of the four expert witnesses. This attorney created chart lists as a payment to JMG a 7.5 million wire transfer that literally states on the wire transfer, quote, loan to Paul Krause. That's OW77. And it lists as a loan to JMG payment by Woolley to Woolley's personal legal counsel of legal bills, including for drafting a notice of default against JMG. How is that a loan to JMG? This makes no sense. And the district court rejected this attorney created evidence. Likewise, Appellants Opening Brief repeatedly cited a document unilaterally created by Appellants Litigation Council that they titled on their own stipulated facts. They were not stipulated to, and this is very misleading. Even according to Ohadi Woolley's own self-serving records, they received $20 million from JMG in the year preceding the filing of the fraudulent transfer action and provided less than $1 million to JMG during that same time. This is OW App 3720-21 cited on Ohadi Woolley's brief at page 39. In Sherman, on page 1357, this court stated, quote, the presence of three badges of fraud is sufficient to establish fraudulent intent, end quote. And what were the three badges of fraud in Sherman? Insider, transfers were of almost all assets, and solvency. Those are factual findings, and the district court found all three here as well. But the court found much more. The court found intent, first based on Appellant's actions, and separately based on the badges of fraud. Mr. Sands, before your time expires, I did have a question for you. And that is, there seem to be some differences in the amended decision and the amended judgment relative to the permanent injunction. Do you have an explanation for the differences there? Is there some clarification that needs to be made by the district court as to the permanent injunction? Your Honor, roughly the only thing that changed between the two judgments is that the district court deleted its rulings that were going to appoint a receiver to take over JMG. And the reason the district court deleted those rulings is because during the time of the preliminary injunction, despite this court's preliminary injunction, JMG liquidated almost all of its assets. Nearly every single aircraft, and a huge amount of spare parts. And so there was no value left for the receiver to administer. If I could follow up on that, I thought that the judge also removed the prohibition on sales. I think you judged Coughlin. And he cited the fact of the $20 million bond as a reason why there was no need to prohibit the sales going forward. And so if that's correct, my question is whether the injunction on foreclosure of assets should remain in place or whether the bond is sufficient to provide any relief that's ultimately awarded. I see my time is up, but if I may respond. You can answer the question. Feel free to answer the question. Thank you. So as a practical matter, your honor, JMG is currently in its second round of bankruptcy. It's being administered now by a trustee. And so the practical answer is that none of this matters anymore because the trustee is administering JMG's assets and its attempts to recover value for creditors. What matters is the findings of actual fraud and the judgment in favor of my client. May I have a few seconds to wrap up my remarks? Just a few seconds. Sure. Thank you. So your honor, the term badges of fraud is visual. One badge of fraud is a danger sign. And as this court held in Sherman, an appellant decorated in several badges of fraud almost certainly has intent. The district court found that appellants are plastered head to toe with seven to ten badges of fraud for every transfer. Thank you. Thank you, Mr. Sack. Mr. Gordon, your rebuttal. Yes, your honor. Thank you. First of all, in response to Justice Erickson's last question previously with regard to a schedule of all of the assets and payments, etc. We did submit that through a declaration from Emily White. We can't find the reference in the appendix to that. If the court wishes, we will provide that, simply the reference to it, to provide that help and assistance. As far as the injunction is concerned, yes, it does matter. While the matter is now in bankruptcy, if international gets paid their entire amount by virtue of the bond, then this court, Judge Katan, did not necessarily declare all of the liens invalid. As to international, he held them to be fraudulent. But that's an issue to Mr. Sands' right. It's in bankruptcy to the extent that the injunction is lifted. Nothing can happen given the 362A stay of bankruptcy until the bankruptcy court works. But the injunction should be lifted with the payment of the bond. Is the bond sufficient to cover all relief that was ordered? We understand it is. It's $20 million and it should be. And don't forget, there's also before this court the issue of the attorney's fees and the assessment of the attorney's fees, which is a separate appeal, to about $8 million or $9 million as to whether or not they can be assessed against the Ohati Wuli parties under the term loan agreement that was executed between JMG. Which order of the district court is at issue in the attorney's fees question? Pardon me? Which order of the district court is being appealed on the basis of attorney's fees? It's a separate order allowing attorney's fees, Your Honor. But what's the date on that order? I don't have it in front of me, but it was shortly after the entry of the judgment. It's in separate appeals. And have those been consolidated? Yes, the appeals are both appealed by JMG International and appealed by the Ohati Wuli parties. They were consolidated. Yes. The Ohati Wuli parties lent $61 million. They got paid back $41 million. There was no determination by the court as to what were valid liens. The court ignored that. To the extent they were valid liens, they never can be transfers. Never. None of this is relevant. To the extent they were not subject to payments on valid liens, then you get into the curms of the MUFTA. The court never did that. If it's reasonable equivalent value, then they're protected under certain circumstances. The court never did that. Never even mentioned that. Never went there. The argument by Mr. Sant about JMG's errors and what JMG did and wrongful actions. JMG is not the client. JMG also left my clients empty handed to the tune of about $15 or $16 million. It's not necessarily that my clients are participating in this to their advantage. They lent money. They got paid back part of it. The Ohati loan was done before the term loan ever came in. Loans were done before the term loan matured. The payments were made before it went to judgment. These loans were properly documented and advanced. Counsel, what's your reply to the Appleese statements about the assets disappearing between the last iteration of this case and the current one? Those assets were with JMG. To the extent they were their assets, their assets, we didn't take them. We didn't foreclose on them. We didn't see them. My clients didn't see them. To the extent that my clients got paid, the payment ceased with the judgment. What they're doing is trying to include everyone in one big pot. And that's not correct. As far as the stock is concerned, the court found that to be a fraudulent transfer. The stock, and I have to admit, there was no security issue with the stock. It was turned over to Mr. Helsen. It shouldn't have been. He shouldn't have asked for it, but it was immediately turned over to the bankruptcy court. It was never sold. It was never transferred. As far as the SAA, contrary to Mr. Sun says, if you look at the findings, and I think it's finding number 82, I'm looking for it now, the court held that it was not, the SAA was not to acquire a new lien to extinguish the al-Hadi libel lien and was to confirm the underlying security agreement. With that, your honor, unless the court has any questions, I would just say in conclusion, the court ignored the fraudulent transfer statute. To the extent that there were problems, the court that, or defenses, the court simply did a blanket coverage in saying, hey, everything's fraudulent. That's not a application of the fraudulent transfer statute. That's not in accordance with this court's decision in Kelly. Unless the court has any questions. Thank you, Mr. Gordon. I don't see any. Thank you, Mr. Gordon. Thank you also, Mr. Sant. The court appreciates both counsel's argument and the presentations you've made to us this afternoon and we'll continue to review the materials in the case and render decision in due course. Madam Clerk, I believe that concludes our calendar for this afternoon. Is that correct? Yes, it is, your honor. All right. That being the case, court will be in recess until tomorrow morning at 9 a.m. Thank you. Counsel would be excused.